**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Brittany Buescher, et al., | ) | **CASE NO. 1:13 CV 2821** |
| | ) | |
| Plaintiffs, | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| vs. | ) | |
| | ) | |
| Baldwin Wallace University, et al., | ) | **Memorandum of Opinion and Order** |
| | ) | |
| Defendants. | ) | |

**Introduction**

This matter is before the Court upon defendants' Motion for Summary Judgment on the

Remaining Claims (Counts I, V, VI, VII, VIII, and X) in Plaintiffs' Complaint (Doc. 13) and

defendants' Motion to Strike Consent Agreement and Affidavits of Plaintiffs, Lydia Glaude, and

June Romeo (Doc. 19).  This case alleges that plaintiffs were treated in a discriminatory manner

as students in Baldwin Wallace University's Accelerated Bachelor of Science Degree in Nursing

Program (ABSN), they were misled into enrolling in the program, and wrongfully terminated

from it.  For the following reasons, the Motion for Summary Judgment is GRANTED and the

Motion to Strike is granted in part and denied in part.

1

**Facts**

Plaintiffs Brittany Buescher, Emily Kopper, Rachel Lane, Estaban Rodriguez, and Irene Kellett filed this Complaint against Baldwin Wallace University (BWU) and Guy E. Farish, its Interim Vice President for Academic Affairs and Dean.

The Complaint originally set forth thirteen claims: I (breach of contract), II (breach of the duty of good faith and fair dealing), III (fraud), IV (negligence), V (violation of the Rehabilitation Act and Americans with Disabilities Act), VI (unjust enrichment), VII (promissory estoppel), VIII (constructive dismissal/retaliation), IX (intentional misrepresentation), X (negligent misrepresentation), XI (intentional infliction of emotional distress), XII (negligent infliction of emotional distress), and XIII (age/disability/sexual orientation/gender/racial discrimination). All counts applied to all plaintiffs except Count V which applied only to Buescher and Count VIII which applied only to Lane and Kopper. Defendants sought dismissal of Counts II, III, IV, V, IX, XI, XII, and XIII.  By Memorandum of Opinion and Order, this Court dismissed these claims with the exception of that portion of Count V alleging a violation of the ADA and Rehabilitation Act against defendant BWU.

Defendants submit the declaration of James Fell, who was Associate Director and Associate Professor of BWU's ABSN Program during the 2012-2013 academic year. He states that in 2012, BWU introduced the new, accelerated nursing program which was designed to provide students with a Bachelor of Science in Nursing degree (BSN) in 12 months.  In the fall of 2012, 29 students, including the five plaintiffs, enrolled in the program and began the first year.  Nineteen of these students successfully completed the ABSN program, and 18 then passed the licensure examination on the first attempt. The 19th student passed on a subsequent attempt.

2

At that time, all students received a copy of the Student Handbook for the Academic Year 2012-2013.  Fell submits a copy of the Handbook with his declaration. (Fell decl.)  The Handbook states in pertinent part:

**Program Progression Standards**

**Calculation of averages for progression**

- ABSN students must maintain a minimum cumulative GPA of 2.75 each term to continue in the nursing program. Failure to achieve this GPA will result in dismissal from the program.

- ABSN students may <u>not</u> earn more than two grades of "C" during the program. Earning a grade of "C" in a <u>third</u> course will result in dismissal from the program.

- ABSN students who fail a course will be dismissed from the program, but may reapply in a subsequent year.

**Program Progression Standards**

1. Calculation of grade point average (GPA) for progression in the program once a student is admitted to the nursing sequence includes the following:

- ABSN students must maintain a minimum cumulative GPA of 2.75 each term to continue in the nursing program.
- Failure to achieve a minimum of 2.75 GPA each term will result in dismissal from the program.
- Courses are graded A B, C, or F.
- ABSN students may not earn more than two grades of "C" in the program. Earning a grade of "C" in a third course will result in dismissal from the program.
- ABSN students who fail a course will be dismissed from the program, but may reapply the following year.

**Course Progression Standards**

1. Students will be evaluated on a regular basis in each didactic and clinical course.
2. Students will receive a midterm grade notification, allowing time for remediation as necessary.
3. The grading scale for nursing courses is as follows:
93 -100% A
85 -92% B

3

75 - 84% C
Below 75% F

**Clinical Performance**

- Students are required to safely and proficiently demonstrate the behaviors listed on the Rubric: Clinical Judgment tool for each clinical course.
- Students who demonstrate required behaviors in a safe and proficient manner in the clinical area will earn a grade of "S" for (Satisfactory) performance.
- Failure to demonstrate the identified behaviors will result in the student earning a grade of "U" or (Unsatisfactory) for the clinical experience and a grade of "F" (failure) will be recorded for the course.
- The clinical preceptor/instructor may temporarily remove a student from clinical experience if the student's level of preparation is inadequate or if performance is determined to be unsafe.
- The program reserves the right to terminate the clinical experience of a student in any course if the student's performance is unsafe and/or potentially harmful to clients. This action will result in the student will [sic] receiving a clinical grade of "U" or (Unsatisfactory) and a course grade of "F".
- An excused absence from Clinical <u>must</u> be made up. Students should review the policies for attendance and discuss with the course professor any questions that they may have. In the event of unforeseen events, such as inclement weather, arrangements will be made for make-up Clinical time.
- Transportation to and fees associated with parking at the clinical sites are the responsibility of the individual student.

**Dismissal Policy**

- Students earning a grade of "C" or lower in more than two nursing courses (including clinical courses) will be dismissed from the program.
- The Baldwin Wallace Accelerated BSN program retains the right to dismiss from the program any student who is deemed to violate:

  a. policies and procedures of the ABSN program;
  b. policies of affiliating clinical facilities; or
  c. professional behavior and role development standards as outlined in the ABSN Handbook, the Baldwin Wallace University Handbook, or affiliating agency policies.

(Fell decl. Ex. 1).  The ABSN Student Handbook also provides, "Two or more missed clinical days in any given clinical course will result in a failure for that course."  Finally,

<u>**Special Accommodations for Students with Disabilities**</u>

4

- Any student with a documented disability (e.g., physical, learning, psychological, vision, hearing, etc.) who feels s/he may need an accommodation based on the impact of that disability should contact the Disability Services at 440-826-5936 in the Ritter Library, Room 207, to establish eligibility and to coordinate reasonable accommodations. Students will not be accommodated unless they provide their instructors with a letter from Disability Services
documenting their eligibility and delineating reasonable and appropriate accommodations. The accommodation letter must be updated each semester. Students are encouraged to meet with each professor early in the semester to discuss their disability letter regarding how to implement their accommodations in relation to specific course requirements.

A calendar is set forth which divides the school year as follows: August 6- October 26, Fall I; October 29- December 21, Fall II; January 2- February 22, Spring I; February 25- April 19, Spring II; April 22- July 19, Summer I and II. (*Id.*)  All plaintiffs received a copy of the Handbook.

Brittany Buescher testified to the following.  She understood when she applied that this was an accelerated, condensed 12 month program.  She was aware that receiving three Cs would result in dismissal from the program. Sometime after the program began, Buescher spoke with BWU's Disability Services regarding an accommodation for her disability, ADD.  During the fall semester, Buescher's doctor faxed an ADD/ADHD Verification Form to BWU's Disability Services.  (Doc. 13 Ex. H) The form is dated October 2, 2012, and the fax is dated October 2, 2012/resent December 5, 2012.  (*Id.*)  Buescher understood that the Handbook stated, "Students will not be accommodated unless they provide their instructors with a letter from Disability Services documenting their eligibility and delineating reasonable and appropriate accommodations. The accommodation letter must be updated each semester."  Although she "had a letter in the works, [she] did not present it to anybody." In a November 30, 2012 email, Buescher told one of her instructors that "Im [sic] really scared of getting kicked out for my

5

grades" (Doc. 13 Ex. I) because at that point, Buescher testified,  "I might have had the two Cs." Buescher did not complain to any faculty member that the two Cs were unfair. In late February 2013, Buescher had received a third C and was notified that she had been dismissed from the program. (Buescher depo.)

Emily Kopper testified to the following. She had received the Handbook and was aware of the provisions, set forth above, regarding clinical performance and that two or more missed clinical days in any clinical course would result in a failure for that course.  She also acknowledged that for BWU students to participate at a facility in the clinical setting, the students were subject to the facility's requirements with respect to their functional abilities. Within the first two weeks of the program, Kopper broke her left wrist and was in a hard cast for about six or seven weeks.  At that time, she was assigned in a clinical setting at St. Augustine which allowed her to continue the assignment with the cast.  But at the end of 2012, Kopper suffered another injury to her other wrist, her dominant hand. She underwent surgery and had to wear a removable brace. Kopper had two clinical assignments for that semester beginning in January 2013, one being at Regency Hospital. She was still wearing her brace on the first day of that clinical. Kopper then learned that Regency Hospital's policy was that no one could participate in the clinical setting wearing a restrictive device such as the one she was wearing. As a result of the policy, she missed two days of the clinical. In mid-January, Kopper voluntarily withdrew from the program because of her injury.  (Kopper depo.)

Rachel Lane testified to the following.  She was aware of the Handbook provisions, set forth above, regarding clinical performance.  She received two Cs in the Fall I and Fall II terms. Lane was experiencing personal issues.  Around January 2013, Lane gave regular water to a

6

patient during her clinical assignment when the patient was supposed to receive a thickened liquid.  She acknowledged that this "could have been" life threatening. At some point, Program administrators Fell and June Romeo met with Lane and told her they did not believe she was mentally fit to continue the program based on the error she had made in the clinical assignment and a C grade she had received on a Spring I mid-term exam. In February 2013, the Nursing Council met with Lane to review her current clinical and academic performance, and it was noted that she was experiencing extreme home and marital distress that had been impacting that performance.  (pltf. depo.) Minutes from that meeting show the following.  The purpose of the meeting was to discuss Lane's current academic and clinical performance.  Lane had two Cs in prior Nursing courses and was currently failing a third Nursing course.  A third C would subject Lane to dismissal from the program.  It was also noted that Fell had received a complaint the day before from a Nurse Manager of Grace Hospital that Lane had given water to a patient who had been prescribed thickened fluids which could have caused the patient to aspirate, choke, and die. Fell had previously advised Lane to apply for a medical leave of absence, but she refused.  At the meeting, the Council again recommended that she apply for a leave of absence.  She again refused.  Lane was also advised that she could not return to Grace Hospital in light of the safety breach. One professor volunteered to take Lane into her Medical Surgical group for the remainder of the term, but Lane was advised that if another safety event occurred, she would be dismissed from the clinical area.   (Doc. 13 Ex. J) Lane withdrew from the program a few days after the meeting with the Council.  (Lane depo.)

Estaban Rodriguez testified to the following.  Prior to beginning the program, he was aware that earning three Cs would result in dismissal from the program.  He received three Cs

over the course of the three semesters. He received a C in Fall I, a C in Fall II, and a C in Spring I. As a result, he was dismissed from the program. (Rodriguez depo.)

Irene Kellett testified to the following. She understood "going in" to the program that if she received an F on a course, she would be dismissed. Kellett received an F in Fall II for the Nursing 110L course and was dismissed from the program. Kellett appealed the dismissal. She feels she did not earn the F because she ran out of time on the test and was unable to finish it due to her clinical schedule which left no time to study for the test. There were five students in her clinical group. (Kellett depo.)

This matter is now before the Court upon defendants' Motion for Summary Judgment on the Remaining Claims (Counts I, V, VI, VII, VIII, and X) in Plaintiffs' Complaint and defendants' Motion to Strike Consent Agreement and Affidavits of Plaintiffs, Lydia Glaude, and June Romeo.

**Discussion**

**A. Defendants' Motion to Strike Consent Agreement and Affidavits of Plaintiffs, Lydia Glaude, and June Romeo**

At this point, the Court will address the Consent Agreement. The request to strike the affidavits is more properly addressed within the context of the Motion for Summary Judgment.

BWU ABSN and the Ohio Board of Nursing executed a Consent Agreement in September 2013. This Complaint was filed in December 2013. Plaintiffs rely heavily on the Consent Agreement in opposing the Motion for Summary Judgment, and attach it as an exhibit thereto. Generally, plaintiffs argue that the Consent Agreement is evidence that defendants breached the contract (the Student Handbook) because defendants failed to implement the approved curriculum plan as written in the Handbook in violation of the Ohio Administrative

8

Code which requires that it do so. Defendants have sought to strike the Consent Agreement

arguing that it cannot be used to prove defendants' liability given that it is inadmissible under

Fed.R.Evid. 408 which states in full:

**Compromise Offers and Negotiations**

**(a) Prohibited Uses**. Evidence of the following is not admissible--on behalf of any
party--either to prove or disprove the validity or amount of a disputed claim or to
impeach by a prior inconsistent statement or a contradiction:

**(1)** furnishing, promising, or offering--or accepting, promising to accept, or offering to
accept--a valuable consideration in compromising or attempting to compromise the
claim; and

**(2)** conduct or a statement made during compromise negotiations about the claim--except
when offered in a criminal case and when the negotiations related to a claim by a public
office in the exercise of its regulatory, investigative, or enforcement authority.

**(b) Exceptions**. The court may admit this evidence for another purpose, such as proving
a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to
obstruct a criminal investigation or prosecution.

"Courts generally agree that Rule 408 applies to consent decrees."  *Wilson v. Parisi,* 2009

WL 151666 (M.D.Pa. 2009) "Unless it expressly so states, a consent judgment is not an

admission of the allegations of the underlying complaint."  *In re Bachinski,* 393 B.R. 522

(S.D.Ohio 2008).  Defendants point out that the Consent Agreement does not expressly state a

specific admission of misconduct and states that it is not an order of adjudication.  (Doc. 17 Ex.

C)

Plaintiffs argue that the Consent Agreement must be considered for a couple reasons.

First, plaintiffs contend that Rule 408 does not apply to non-parties, and because plaintiffs were

not parties to the Consent Agreement, it cannot be excluded.  But, plaintiffs cite no authority to

9

support this argument.  Rather, cases have excluded consent agreements where plaintiffs were not parties to the agreement.  *See, for e.g., Wilson v. Parisi, supra.*  Plaintiffs also note that the Consent Agreement does not specifically refer to their claims or specify any of them by name.  As noted earlier, however, the Consent Agreement was executed prior to the filing of this lawsuit.

Second, plaintiffs contend that the Consent Agreement must be considered based on the exception set forth in the rule relating to negotiations of a public entity, here, the Ohio Board of Nursing, in furtherance of its regulatory and enforcement duties.  However, as clearly set forth in the rule, this exception applies "when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority."  Because this is not a criminal case, that exception does not apply.  Plaintiffs also argue that because the Consent Agreement has been made public it should be considered.  This, however, does not change the fact that plaintiffs are attempting to use the agreement to prove liability.  The motion to strike the Consent Agreement is granted.

**B.  Motion for Summary Judgment**

**<u>Standard of Review</u>**

Summary Judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial
> responsibility of informing the district court of the basis for its

10

> motion, and identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with affidavits," if any, which it believes demonstrates the
> absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).  A fact is "material only if its resolution

will affect the outcome of the lawsuit."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate

that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip*

*Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir.1993).  The nonmoving party may not simply rely on

its pleading, but must "produce evidence that results in a conflict of material fact to be solved by

a jury." *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

The evidence, all facts, and any inferences that may permissibly be drawn from the facts

must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co.*

*v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs.,*

*Inc.*, 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in

support of the plaintiff's position will be insufficient; there must be evidence on which the jury

could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

Summary judgment should be granted if a party who bears the burden of proof at trial

does not establish an essential element of his case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d

937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Moreover, if the evidence is "merely

colorable" and not "significantly probative," the court may decide the legal issue and grant

summary judgment.  *Anderson*, 477 U.S. at 249-50 (citation omitted).

**Discussion**

As an initial matter, plaintiffs do not respond to defendants' assertions that summary

11

judgment is warranted as to any personal liability against defendant Guy Farish, and as to Counts VI (unjust enrichment) and VII (promissory estoppel).  The Court finds that summary judgment is warranted for the unopposed reasons stated in defendants' motion.

### 1. Breach of Contract (Count I)

To survive summary judgment on a claim for breach of contract, plaintiffs must point to some evidence supporting each element: the existence of a contract, performance by plaintiff, breach by defendant, and damage to plaintiff.  *McDade v. Cleveland State University,* 2014 WL 4557015 (Ohio App. 10th Dist. Sept. 16, 2014).  Ohio law addresses breach of contract claims in the university context.[1]  In *Jefferson v. Univ. of Toledo,* 2012 WL 4883203 (Ohio App. 10th Dist. October 16, 2012) (internal quotations omitted), the court stated,

> In *Bleicher v. Univ. of Cincinnati College of Medicine*, 78 Ohio App.3d 302 (10th Dist.1992), ... [the court] acknowledged the long-standing principle that when a student enrolls in a college or university, pays his or her tuition and fees, and attends such school, the resulting relationship may reasonably be construed as being contractual in nature. The terms of such contract are found in the college catalog and handbook supplied to students. *Embrey v. Cent. State Univ.*, 10th Dist. No. 90AP–1302 (Oct. 8, 1991).
>
> A court's standard for reviewing the academic decisions of a college is not merely whether the court would have decided the matter differently but, rather, whether the faculty action was arbitrary and capricious. *Bleicher* at 308 [other citations omitted]. Accordingly, a trial court is required to defer to academic decisions of the college unless it perceived such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment. *Id.*

*See also Tate v. Owens State Community College,* 2011 WL 2685664 (Ohio App. 10th Dist. July

---

[1]     Plaintiffs rely on a 1965 District of Vermont case although Ohio law clearly addresses the issue. *Connelly v. University of Vermont and State Agricultural College,* 244 F.Supp. 156 (D.Vermont 1965).  However, even that case recognizes that a court should not interfere with decisions of school authorities in matters of scholarship unless the school's action is arbitrary and capricious, or in bad faith.

12, 2011) (citations omitted) ("It is well-settled that there is a contract established when a student enrolls, pays tuition, and attends classes at a school. This contract is typically found in a handbook, catalogue, or other guideline. Furthermore, when dealing with such a breech [sic], the court is to defer to the decisions of the school unless it can find such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment."); *Lemon v. University of Cincinnati,* 112 Ohio Misc.2d 23 (Ct. of Cl.2001) (stating the same); *McDade v. Cleveland State University,* 2014 WL 4557015 (Ohio App. 10th Dist. Sept. 16, 2014) (Stating the same and that to prove a breach, plaintiff must show that defendant did not abide by the terms of the student handbook or other policies and guidelines.); and *Frank v. University of Toledo*, 621 F.Supp.2d 475 (N.D.Ohio 2007) (stating the same with citation to  *Bleicher v. Univ. of Cincinnati College of Medicine*, 78 Ohio App.3d 302 (10th Dist.1992)).

Prior to addressing the individuals, plaintiffs assert that BWU committed multiple breaches of the contract and list seven alleged breaches: 1) Defendants failed to implement the Program Progression Standards as outlined in the Handbook in violation of their own polices and the Ohio Administrative Code; 2) defendants changed the grading system from letter grades to pass/fail and back to letter grades during the first two semesters in violation of the Handbook and Ohio Administrative Code; 3) defendants altered the syllabi for classes to plaintiffs' detriment in violation of the Handbook and Ohio Administrative Code; 4) defendants arbitrarily and capriciously afforded some students the opportunity to make up clinical days while denying other students the same; 5) defendants failed to accommodate students with documented disabilities; 6) in spite of provisions in the Handbook for a grievance and appeal process, none

13

existed; and 7) despite provision in the Handbook for midterm notification to students which would allow time to remediate grades, no such opportunity was afforded to plaintiffs.

In reply, defendants counter only that plaintiffs fail to cite admissible record evidence and/or any specific provision of the Handbook or Ohio Administrative Code, fail to identify how a change in the Program Progression Standards violated the Handbook or Ohio Administrative Code, and fail to explain how defendants altered the syllabi in violation of the Handbook or Code. To the extent these alleged breaches are presented as to the individual plaintiffs, the Court will address them below.

**(a) Buescher**

Buescher was asked at deposition about the basis of her breach of contract claim. She responded as follows. Although the students were told that they would have no more than 40 hour weeks, including class time and clinical hours, this was exceeded continuously throughout the program. Additionally, while the program started off with grades, it was then switched to pass/fail and the students were told "to not worry about what our grades were, to not shoot for a higher grade, to just worry about learning and staying calm..." The pass/fail system was then switched back to the letter grade system. Finally, she was not accommodated for her disability. (Buescher depo. 108-109)

First, with regard to class time and clinical hours, defendants point out that Buescher acknowledged at deposition that the students were told that "it should not exceed" the 40 hours. Defendants also point out that the Student Handbook does not provide that the class time and clinical hours per week shall not exceed 40 hours.

In response, plaintiffs point to the Consent Agreement between BWU ABSN and the

14

Ohio Board of Nursing which, they assert, establishes a breach of contract given that it acknowledges that BWU did not implement the curriculum plan as written in the Handbook.[2] As discussed above, the Consent Agreement cannot be considered to prove liability.[3] Thus, because class time and clinical hours in excess of 40 hours per week did not violate the terms of the Handbook, plaintiff does not show a breach of contract.

Second, with regard to the temporary change in the grading system, defendants assert that it was not arbitrary and capricious and, in fact, the Handbook provided for the letter grades which were ultimately used following the brief change to pass/fail.  Defendants contend that plaintiffs suffered no damages as a result of the change because BWU then followed the letter grading system which was applied uniformly to all students in the program.  Defendants do not

---

[2]     Ohio Administrative Code 4723-5-13 addresses curriculum for a registered nursing education program and states that the curriculum shall be "implemented as written."

[3]     Nor does the Consent Agreement state that students' class time and clinical hours exceeded 40 hours in violation of the written curriculum plan.  Rather, the Consent Agreement states:

> ... BWU did not implement its approved curriculum plan and sequence of courses as required.  Specifically, in December 2012, the former program administrator reported changes in the curriculum as implemented that decreased the total number of laboratory hours, increased the total number of clinical hours, and changed the total hours of instruction from 1656 hours to 1680 hours.  On January 17, 2013, a revised curriculum plan, dated November 28, 2012, was provided to the Board.  This plan stated that clinical hours were reduced in the Fall I term and the hours were shifted to subsequent terms resulting in the redistribution of laboratory and clinical hours in upcoming courses.  Accordingly, the approved curriculum plan and sequence of courses were not implemented as written.

(Doc. 17 Ex. C).

15

provide an explanation addressing the "brief" change in the grading system.

Plaintiffs contend that BWU breached its contract by changing the manner in which the students would be graded. Plaintiffs assert this was arbitrary and capricious, and that defendants did not exercise professional judgment. Plaintiffs contend that instead of receiving a "pass," Beuscher received a third C which resulted in her dismissal.  Plaintiffs submit the following evidence which addresses the change in the grading system.

According to Buescher's affidavit, in October 2012, the students were informed that to reduce stress, the course progression standards were being altered from the letter grading scale contained in the Student Handbook to a pass/fail system.  The students were evaluated on the pass/fail system from October and into December 2012.  In December 2012, immediately prior to the final exams, the grading system reverted back to the letter grading system.  She avers:

> 6.  As a result of the changing grading system I did not receive an accurate evaluation of my academic progress.
>
> 7. As a result of the changing grading system I was not fairly apprised of my grade point standing.
>
> 8. As a result of the changing grading system I believed my academic progress was in the range necessary to allow me to successfully continue in the ABSN program.
>
> 9. I was terminated from the program for failing to maintain the grades required in the Student Handbook.
>
> 10. I was prejudiced due to the changing grading system and was separated from the ABSN program because of it.

(Buescher aff.)[4]

"Affidavits which merely set forth conclusions or opinions without stating supporting

---

[4]     Plaintiffs Kellett, Lane, and Rodriguez make the same averments in their affidavits.

16

facts are insufficient to meet the requirements of Civil Rule 56(E)." *Nationstar Mtge., L.L.C. v. Williams,* 2014 WL 5141644 (Ohio App. 5th Dist. October 13, 2014). Buescher's averments contained in paragraphs 6-8 and 10 are based on her own opinions and must be stricken. Furthermore, it should be noted that although Buescher avers that she believed her academic progress was in the range necessary to successfully continue the program, her November 30, 2012 email to an instructor seems to contradict this wherein its states, "Im [sic] really scared of getting kicked out for my grades!!"

Plaintiffs also submit the affidavit of June Romeo, former Director of the BWU ABSN Program from August 2012 through February 2013.  Defendants assert this affidavit should be stricken because it contains statements not based on personal knowledge and inadmissable opinions. Concerning the temporary change in the grading system, Romeo avers,

> 12. In an effort to alleviate stress on the students resulting from the organizational deficiencies of the program, I in conjunction with the faculty/administration made the decision to move from a letter/numeric grading system to a pass/fail grading system.

> 13. Subsequently, it was determined that this change of grading ran afoul of Ohio Board of Nursing (OBN) Rules concerning student progression standards.

> 14. In approximately December 2012, input from the OBN caused the ABSN to revisit and reverse the implementation of the pass/fail system.

> 15. Certain students suffered unfair prejudice in the transposition of their grades achieved in the interval of the pass/fail grading system.

> 16. Given the need to transpose a pass/fail grading system into a letter/numeric grading system, certain ambiguities existed and faculty exercised subjectivity in handling this reassignment.

> 17. I believe that in transposition of grades, some faculty prejudicially exercised their discretion to the disadvantage of certain students.

> 18.  In my classes... I would, as I felt necessary, modify the syllabi in a manner that I felt was in keeping with students' progress.

17

(Romeo aff.)  Defendants contend that paragraphs 15, 16, and 17 are not based on Romeo's personal knowledge and contain subjective opinions.

Affidavits must be made on personal knowledge.  Fed.Rule 56(c).  Beliefs do not meet the evidentiary standard set forth in Rule 56(e).  *Totman v. Louisville Jefferson County Metro Government,* 391 Fed. Appx. 454 (6th Cir. 2010) (citing *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir.2007) (holding that the affiant's "statement ... based upon his 'belief' ... did not demonstrate the personal knowledge required by Fed.R.Civ.P. 56(e)").  Courts outside this Circuit have likewise concluded that a combination of personal knowledge and belief is insufficient to raise a genuine issue of material fact to defeat summary judgment.  *Harrison v. Culliver,* 746  F.3d 1288 (11th Cir. 2014) (Averments that "to the best of his belief and knowledge" cannot create a genuine issue of fact because the statement shows that the affiant did not rely on his personal knowledge.); *Tara Productions, Inc. v. Hollywood Gadgets, Inc*., 449 Fed.Appx. 908 (11th Cir. 2011)(quoting *Ellis v. England*, 432 F.3d 1321, 1327 (11th Cir.2005). ("We have held that 'mere conclusions and unsupported factual allegations, as well as affidavits based, in part, upon information and belief, rather than personal knowledge, are insufficient to withstand a summary judgment motion.' ") Romeo does not state how she has personal knowledge that certain students suffered unfair prejudice in the transposition of their grades or how she has personal knowledge of other faculty's actions.  Additionally, she states, "I believe..."  These statements are not admissible.

Finally, plaintiffs submit the affidavit of Lydia Glaude who avers that she was hired in 2011 to develop the ABSN program at BWU.  As to the change in the grading system, she avers:

> 7.  Based on my knowledge education and experience I understand that it is a violation of Ohio Board of Nursing Rule 4723-5-12 for a nursing program to implement changes in

the policies for student progression including grading methods for students who are currently enrolled in a program at the time the changes are adopted.

8. A professional nursing program which changes the grading system from letter grades, to pass/fail and back to letter grades in the course of an academic semester demonstrates a lack of professional judgment.

9. Based on my knowledge of the Ohio Board of Nursing Rules which governs nursing education in Ohio Baldwin Wallace University's changing the grading system from letter grades, to pass/fail and back to letter grades with the same cohort of students is unreasonable and a departure from acceptable academic practices.

(Glaude aff.)  Defendants argue that these averments are impermissible opinion testimony and are not factual statements.  The Court finds that paragraph 7 can be considered as a statement based on personal knowledge, but that paragraphs 8 and 9 are impermissible opinion.  (Glaude is not offered as an expert qualified to form an opinion.)

Based on the foregoing, the Court does not find that Buescher has established an issue of fact regarding whether the temporary change in the grading system constitutes a breach of contract. Even assuming it was improper for BWU to temporarily change the system, the Court cannot assume that this resulted in the damage to Buescher, i.e., caused her to receive the three Cs which resulted in her dismissal from the program.  As discussed above, Buescher testified that by late November 2012, she had received two Cs and she emailed an instructor indicating that she feared being dismissed for her grades.  In late February 2013, she received the third C. Furthermore, plaintiffs assume the change was arbitrary and capricious without addressing the meaning of that term.  Ohio cases have defined arbitrary and capricious:

The term 'arbitrary' means without fair, solid, and substantial cause and without reason given; without any reasonable cause; in an arbitrary manner, fixed or done capriciously or at pleasure; without adequate determining principle; not founded in the nature of things; nonrational; not done or acting according to reason or judgment depending on the will alone; absolutely in power; capriciously; tyrannical; despotic. Similarly 'caprice' is defined as whim, arbitrary, seemingly unfounded in motivation.

19

*Gerken v. State Auto Ins. Co.* of Ohio, 20 N.E.3d 1031 (Ohio App. 4th Dist. September 8, 2014) (internal citations and quotations omitted). The only evidence before the Court as to why the system was changed is Romeo's averment that it was done "in an effort to alleviate stress on the students resulting from the organizational deficiencies of the program."  A reason, therefore, was given and the Court is unable to find that the change was arbitrary and capricious.

Third, with regard to the failure to provide a disability accommodation, defendants assert that Buescher failed to complete her prerequisite obligations.  Buescher testified that sometime after she started the program, she talked with Kevin Jackson in BWU's disability department about getting accommodations.  (Buescher depo. 29)  On September 21, 2012, Kevin Jackson, BWU's Disability Services Specialist, informed Buescher via email that she would need to complete verification forms and an application for Disability Services.  (Doc. 13 Ex. K) Faxed verification forms from her doctor were sent to Disability Services in October 2012 and resent in December 2012. When asked at deposition whether she filled out the application for Disability Services, Buescher responded, "I don't remember."  (Buescher depo. 97) Additionally, as set forth above, the Handbook required that Buescher provide her instructors with a letter from Disability Services documenting her eligibility and delineating reasonable and appropriate accommodations.  At deposition, Buescher testified that she never presented such a letter to her instructors although she had one "in the works."  (*Id.* 55-56) On these grounds, defendants assert there was no breach of the contract.

Buescher points to an email she wrote to June Romeo on September 3, 2012:

Hi Dr. Romeo,

I am in the abyss of reading and studying and also still making arrangements from my last school for Disability Services, to get the paperwork arranged and to you.  I am a

Disability Student and need to talk to you when I can about it when we have a chance... usually for test taking I take tests in a separate room with extra time, so perhaps I can arrange with Sara or come in early on test days.  Whatever is convenient for you please let me know.  Im embarrassed having disabilities but I wanted to give you a heads up and to also if possible start having office sessions with you.

Romeo responded:

Dear Ms. Buescher,

Disabilities are handled only through the Learning Center, not by individual faculty. However, I must tell you that in the ABSN program accommodations are not made.  This was stated on the form describing the functional abilities required of nursing students that your physician signed as part of your admission, and is also found in the student handbook.  Because of the need for nursing students and nurses to be able to think on their feet, to work in situations of ambiguity and uncertainty, and to be able to respond immediately in all situations, our students must be able to handle all class work, laboratory work, and clinical work without special accommodation.

(Doc. 17 Ex. D)   Buescher contends that because Romeo had unequivocally denied the possibility of accommodation, she was not required to produce the disability letter to her instructors.

Defendants do not specifically address this claim in their reply brief and only point out (in addressing the failure to accommodate claim) that Romeo's email states, "Disabilities are handled only through the Learning Center."  Regardless, plaintiff has not demonstrated an issue of fact as to breach of contract given that the Handbook requires that plaintiff produce a letter to her instructors.  Plaintiff did not do so and cannot show that defendants breached the Handbook.[5]

---

[5]     It should also be noted that Buescher testified at deposition that she did not appeal to anyone Romeo's refusal to accommodate her disability.  (Buescher depo 48) The Handbook provides a "Grievance and Appeal" procedure which states that any grievance may be brought to the Nursing Council.  (Doc. 17 Ex. A at 24) In her affidavit, Buescher avers, "At the time of my separation from the ABSN program I was not given recourse to the grievance, appeal procedures as outlined in the student handbook."  (Buescher aff.¶ 11) Defendants assert that this averment conflicts with the prior sworn deposition testimony.  While plaintiffs

This issue will be addressed again in connection with Buescher's failure to accommodate claim.

**(b) Kopper**

Plaintiffs assert the following with regard to Kopper's breach of contract claim.  Kopper was forced to withdraw from the program because she broke her wrist on December 29, 2012 and was informed that she would have to miss two clinical days with no opportunity to make up clinical hours.  To the contrary, plaintiffs assert, there was an opportunity to make up clinical hours.  Plaintiffs submit the affidavit of Lydia Glaude who avers, "As author of the ABSN Student Handbook I have specific knowledge that the handbook provided for two clinical Make Up Days, July 20 and 21, 2013, to allow students to complete up to two days of lost clinical time."  Likewise, Kopper avers that she was "forced" to take a medical leave and was terminated from the program when she was "given misinformation" based on the fact that she missed two clinical days even though the Handbook provided for two make up days for clinicals missed. (Kopper aff. ¶¶ 6, 7, and 9) Additionally, Kopper avers,

> 12. In January 2013, I learned that other ABSN students had been allowed to make up clinical hours lost in October 2012 in the January 2013 semester.

> 13.  I also learned that some of my classmates received clinical hours for participating in an unsanctioned clinical trip to Lubec, Maine which subjected the ABSN to admit wrongdoing in a consent agreement with the Ohio Board of Nursing.

(Kopper aff.)  Plaintiffs assert that this all amounts to the arbitrary and capricious application of policies relating to clinical hours and is a breach of contract.

---

> point out that a court may consider such inconsistencies when an explanation is provided, no such explanation is given.  Therefore, the Court notes that if Buescher considered Romeo's response to be a refusal to accommodate, she could have brought the concern to the Nursing Council rather than simply failing to provide the materials requested by the Disability Specialist.

Defendants seek to strike paragraphs 12 and 13 of Kopper's affidavit because the statements are not based on personal knowledge, but on hearsay or speculation.  The Court agrees.  Kopper's affidavit does not contain a statement that the averments are made on personal knowledge and the Court cannot assume that Kopper "learned" of these instances from her own personal knowledge rather than from information received from others.

Defendants do not address Kopper's assertion that there was a breach of contract because she was forced to medically withdraw for missing two clinicals although the Handbook contained a provision for making up two clinical days.  Nonetheless, summary judgment is warranted. The Academic Calendar contained in the Handbook merely indicates that July 20 and 21 are clinical make up days.  (Doc. 17 at 2) The Handbook states, under the heading of "Clinical attendance and tardy," that "One excused absence for clinical will be permitted to be made up... Two or more missed clinical days in any given clinical course will result in a failure for that course."  (*Id.* at 13) Kopper acknowledged at deposition that she had already missed two days of the clinical.  Thus, there was no breach of the Handbook.  Even if plaintiffs are correct that the Handbook allowed for the make up of two clinical days, presumably Kopper, who received a copy of the Handbook, was aware of its provisions.  Her deposition testimony establishes that she decided to withdraw from the program.  On this basis, she does not establish a breach of contract.

Finally, Kopper avers, "I was not given recourse to the grievance, [sic] and appeal procedures as stated in the student handbook to appeal the uneven handling of clinical hours which were 'frontloaded' and 'backloaded' for many."  (Kopper aff. ¶) As stated above, the Handbook provides that students may bring grievances to the Nursing Council.  Kopper does not

explain how she was prevented from doing so.

### (c) Lane

Plaintiffs assert that defendants breached the contract as to Lane by temporarily changing the grading system to pass/fail and back to letter grades, by failing to provide preceptors as promised, and by failing to provide consistent clinical placements.  Aside from the discussion regarding the change in the grading system, discussed above, defendants do not address this claim concerning the preceptors or clinical placements.

Lane's claim for breach based on the change in the grading system fails for the reasons stated above.  While plaintiffs argue that the change in the grading system "led to her second C" which ultimately "forced" her out of the program (Doc. 17 at 26), the evidence shows that Lane received two Cs in Fall I and II, made a serious clinical mistake in Spring I, and had received a C on a mid-term exam in Spring I which led to the meeting with the Nursing Council after which Lane withdrew from the program.   As for the lack of preceptors and consistent clinical placements, plaintiff relies on the Consent Agreement which cannot be considered.  Even if it were, it only addresses the lack of a required preceptor as to four of BWU's students and does not address the lack of consistent clinical placements.

### (d) Rodriguez

Plaintiffs assert that BWU "breached the contract with Esteban Rodriguez in all the ways heretofore mentioned and outlined in the admissions of defendants and in the findings of the Ohio Board of Nursing.  However, it was the alteration of the grading system that harmed [him] and ultimately caused him to attain a third 'C' resulting in his separation from the ABSN Program."  (Doc. 17 at 26) Because plaintiffs only specifically address the change in the grading

24

system, arguing that it was a failure to implement the approved curriculum plan as written, the Court will solely address that claim.   As with Buescher, the Court has no evidence that the change in the grading system "caused" Rodriguez to attain a third C.  As discussed above, he received a C in Fall I, a C in Fall II, and a C in Spring I.  Therefore, there was no breach of contract.

### (e) Kellett

Likewise, plaintiffs assert that the change in the grading system and the distribution of the clinical hours "caused" Kellett to receive an F which led to her dismissal from the program. Kellett avers, "Under the Pass/Fail grading system my academic progress was in the range necessary to allow me to continue in the ABSN program." And, "I was prejudiced due to the changing grading system and was separated from the ABSN program because of it."  (Kellett aff. ¶¶ 8, 10) These amount to impermissible subjective opinions. As with the other plaintiffs, there is no evidence that the temporary change in the grading system caused Kellett to receive an F. Kellett testified that she received an F in Fall II because she ran out of time on a test and was unable to finish it.

With regard to the distribution of clinical hours, plaintiffs submit Kellett's affidavit wherein she avers:

> 11.  In the fall of 2012 the ABSN offered limited scheduling opportunities for me to fulfill my clinical hours (as opposed to other students).

> 12.  I was forced to compress the scheduling of my clinical hours into a period of time that eliminated my opportunity to prepare for the examination on which I received an "F" grade.

> 13. My classmates who attended a clinical experience trip to Lubec, Maine were allowed to take that same examination but they were given an extra weekend to prepare.

25

14.  My classmates were afforded the opportunity to take the same examination in an 'untimed' environment as opposed to the 'time' setting in which I was required to take it.

(Kellett aff.)  Defendants assert that paragraphs 11, 13, and 14 are not based on Kellett's personal knowledge and should be stricken.  Plaintiffs do not specifically dispute this and the Court agrees.  She does not demonstrate how she has personal knowledge that "other students" did not have limited scheduling opportunities to fulfill their clinical hours, that classmates had an extra weekend to prepare for the test, and that classmates took the test in an "untimed" environment. Additionally, Kellet testified at deposition that there were five students in the class of 22 taking the test who had clinicals when she had clinicals.  (Kellett depo. at 36) Thus, although unclear from her affidavit, it appears four other students were forced to attend clinicals at a point which eliminated their opportunity, like Kellett, to prepare for the exam.  Finally, Kellett avers that she "was not given recourse to the grievance, appeal procedures as outlined in the student handbook." (Kellett aff. ¶ 15) However, she testified at deposition that immediately following the receipt of the F on the test, Kellett asked June Romeo to reconsider.  When Romeo said that she would not reconsider, Kellett "went to the dean and appealed to the dean." The dean told Kellett she could take it to the Nursing Council and she did so.  (Kellett depo. 80-82) Plaintiffs contend that there is no contradiction between this averment and the testimony because no grievance/appeal procedure existed.  But, the Handbook provides:

**Grievance and Appeal:**

*  Grievances should be resolved at the level of the student, faculty, and program coordinator when at all possible. If resolution is not possible at this level the concern may be brought by the student to the Nursing Council.

* The grievance committee of the Nursing Council is composed of faculty members of the program as well as faculty

26

member[s] of the Department. All such concerns raised and resolved at the Nursing Council level will be documented and maintained in the Grievance File by the Program Coordinator.

(Doc. 17 Ex. A at 24).

The Court cannot conclude that there was a breach of contract as to Kellett.

**(2) Failure to Accommodate as to Buescher (Count V)**

Count Five alleges that defendants discriminated against Buescher in violation of the ADA and Rehabilitation Act by failing to accommodate her disability.  Defendants contend that, for the same reasons stated above, Buescher failed to provide BWU with the information and forms it needed and requested and, therefore, it is entitled to summary judgment on this claim.

Plaintiffs do not dispute that summary judgment is warranted where a plaintiff fails to cooperate in good faith with the university's interactive process.  But, plaintiffs contend that the email from Romeo to Buescher, set forth above, excused plaintiff from having to provide the information given that the Chair of the Program told plaintiff that the program did not offer accommodations.

In reply, defendants restate that plaintiff never requested an accommodation and did not engage in the interactive process because she failed to provide the necessary application and letters to her instructors.  Defendants also point out that Romeo's email acknowledges that "disabilities are handled only through the Learning Center."  Defendants do not address plaintiff's contention that Romeo's email excused plaintiff's obligation to provide the required information and forms.

"A publicly funded academic institution is not obligated to accommodate under the ADA until receiving a proper diagnosis and request for specific accommodation."  *Johnson v.*

*Washington County Career Center*, 470 Fed.Appx. 433(6th Cir. 2012). It is the plaintiff's burden to show he requested an accommodation for his disability.  *Gantt v. Wilson Sporting Goods Co.,* 143 F.3d 1042 (6th Cir. 1998) (In an employment case brought under the ADA, the court reiterated that "the initial burden of requesting an accommodation [is] on the employee.") It is not disputed that plaintiff had a conversation with the Disability Services Specialist sometime after she started the program about getting accommodations.  On September 21, 2012, that specialist informed Buescher via email that she would need to complete verification forms and an application for Disability Services.  She forwarded the verification forms in October and December 2012, but did not complete an application. Nor did Buescher provide her instructors with a letter from Disability Services documenting her eligibility and delineating reasonable and appropriate accommodations as required by the Handbook. Buescher now contends she did not have to comply with these obligations because around September 3, 2012, prior to her communications with the Disability Specialist, June Romeo told her that "in the ABSN program accommodations are not made." But, Buescher corresponded with BWU's Disability Specialist subsequent to her email exchange with Romeo and, in fact, forwarded her doctor's verification forms as requested by the specialist.  Clearly, Buescher was proceeding with her attempt to get an accommodation after Romeo told her that accommodations are not made.  She was given the application for Disability Services on September 21 and did not complete it.  Therefore, she did not request an accommodation for her disability and there can be no failure to accommodate.

### (3) Constructive Dismissal/Retaliation as to Kopper and Lane (Count VIII)

Defendants point out that both Kopper and Lane testified that they voluntarily withdrew from the program.  (Kopper depo. 80; Lane depo. 106-107) They also testified that they were

welcome to return to the program and participate the following year.  (Kopper depo. 77, 105;

Lane depo. 99, 107) Plaintiffs argue at length that Kopper and Lane were actually forced to

withdraw and were treated disparately from the other students.  But, plaintiffs do not

demonstrate that a cause of action for constructive dismissal exists outside the employment

context. Furthermore, "Courts have held that constructive discharge is not itself a cause of

action, but rather a means of proving the element of an adverse employment action where the

employee quits instead of being fired." *Huston v. Mittal Steel USA,* 2006 WL 2709776

(S.D.Ohio September 20, 2006) (citations omitted). Defendants are entitled to summary

judgment on this claim.

### (4) Negligent Misrepresentation (Count X)

In Ohio,

> The doctrine of negligent misrepresentation provides recovery where: 1) a party who, in
> the course of his business, profession or employment, or in any other transaction in which
> he has a pecuniary interest, provides false information; 2) for the guidance of another
> party in its business transaction, 3) causing the other party to suffer pecuniary loss, 4) as
> a result of justifiable reliance on the information, 5) if the one providing the information
> failed to exercise reasonable care or competence in obtaining and communicating the
> information.

*Miller v. Med. Mut. of Ohio*, 2013 WL 3817850 (Ohio App. 5th Dist. July 18, 2013) (citing

*Delman v. City of Cleveland Hts*., 41 Ohio St.3d 1 (1989)). Defendants assert that there is no

evidence that they provided false information.

Plaintiffs assert that Romeo's email to Buescher regarding the accommodation was false,

Romeo's and Fell's statements to Kopper that she could not make up the clinical time were false,

Romeo's and Fell's communications to Lane were false, and defendants' information to all

plaintiffs regarding their academic standing as a result of the ever-changing grading system were

29

false. For all the reasons discussed herein, these statements did not cause the plaintiffs to suffer pecuniary loss (as a result of dismissal from the program) because they justifiably relied on the information.  Rather, Buescher, Rodriguez, and Kellett were dismissed in accordance with the dismissal policy in the Handbook, and Kopper and Lane voluntarily withdrew.

For these reasons, defendants are entitled to summary judgment.

**Conclusion**

For the foregoing reasons, defendants' Motion for Summary Judgment on the Remaining Claims (Counts I, V, VI, VII, VIII, and X) in Plaintiffs' Complaint is granted and defendants' Motion to Strike Consent Agreement and Affidavits of Plaintiffs, Lydia Glaude, and June Romeo is granted in part and denied in part.

IT IS SO ORDERED.


/s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge


Dated: 2/6/15

30